## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BRITTANY SHAVER, TERRY
FRANKLIN, ADRIENNA FRANKLIN-
HILLARD, AMBER FUNGASHA,
STEVENNIA MEDLEY, and ASHARIA
TAYLOR

        *Plaintiffs*,

vs.

       Case No. 09-1193-EFM

ROTTINGHAUS COMPANY, INC.
d/b/a/ SUBWAY,

        *Defendant.*

## MEMORANDUM AND ORDER

This case involves six plaintiffs bringing racial discrimination claims under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq*. Two of the plaintiffs also bring retaliation

claims against Defendant. Before the Court are Defendant's six motions for summary judgment

with respect to each Plaintiff (Docs. 63, 66, 68, 70, 72, and 74). The motions have been fully

briefed. For the following reasons, the Court grants Doc. 63, denies Doc. 66, grants Doc. 68, grants

Doc. 70, grants Doc. 72, and grants Doc. 74.

# I.  Factual and Procedural Background[1]

### *Background Facts Relating to All Employees and Britanny Shaver*

Britanny Shaver, an African-American female, began her employment with Rottinghaus as a Sandwich Artist in January 2006.  At that time, Shaver worked at the Subway store located at the intersection of West Street and Kellogg in Wichita, Kansas ("Store 1" ).  Shaver reported to Robin Smith, Store Manager, and Danielle Heilman, Regional Manager.  Shaver and Smith worked well together, and Shaver demonstrated a strong work performance during her employment at Store 1.

On or about December 7, 2006, Smith and Danielle Heilman promoted Shaver to Shift Supervisor.  On or about July 3, 2007, Danielle Heilman and Kristen Wood ("Wood") promoted Shaver to Manager in Training.  Contemporaneous with this promotion, Shaver was transferred to the store located at 21st Street and Woodlawn in Wichita, Kansas ("Store 2").  Wood was Shaver's Regional Manager at Store 2.

Wood began her employment with Rottinghaus as a store manager in 1998.  Anthony Heilman was her regional manager.  In 1999, Anthony Heilman issued Wood four consultations for various performance issues. Two of those were attendance violations. On June 30, 1999, Wood was placed on probation and warned that she would be terminated if corrective action was not taken. Wood was ultimately demoted from manager by Anthony Heilman and terminated thereafter.  In early 2000, Anthony Heilman rehired Wood and told her "she would have to start from the ground level" and "work her way back up."  In 2006, Wood used the term "nigger rig" when referring to fixing a broken sink.  Wood was verbally counseled, but not written up, for using the phrase. Anthony Heilman was not aware of Wood's use of the term until after Shaver filed her complaint

---

[1]For purposes of this summary judgment order only, the uncontroverted facts are set forth in the light most favorable to the plaintiffs.

with the KHRC.

On or about August 14, 2007, Shaver was promoted to Store Manager for Store 2.  Shaver's promotion was authorized by Wood and Anthony Heilman, Senior Regional Manager.

Shaver's manager responsibilities included hiring employees, training employees, creating weekly labor schedules, documenting employee violations and issuing consultations to employees for such violations, and performing all tasks required by the regional manager.

As Store Manager, Shaver hired Terry Franklin ("Franklin"), Adrienna Franklin-Hillard ("Franklin-Hillard"), Amber Fungasha ("Fungasha"), and Stevennia Medley ("Medley") to work as Sandwich Artists at Store 2.  Wood authorized Medley's hire because Medley had previously worked for Rottinghaus.  Asharia Taylor ("Taylor") also worked as a Sandwich Artist at Store 2. Wood interviewed and hired Taylor.  Franklin, Franklin-Hillard, Fungasha, Medley, and Taylor are all African-American.  Taylor and Franklin began their employment in July and August of 2007, respectively.  Franklin-Hillard, Fungasha, and Medley began their employment in December of 2007.

Shaver was either related to or had a preexisting relationship with all of these employees. Specifically, Franklin is Shaver's uncle; Franklin-Hillard is Shaver's mother; Fungasha went to school with Shaver; Medley is the mother of Shaver's cousin's child; and Taylor is her cousin. Rottinghaus had no formal nepotism policy in 2007 or 2008.

In October 2007, while Shaver was the manager of Store 2, the store received two compliance violation warnings for sanitizing procedures and incorrect bread preparation.  In November 2007, Store 2 received a compliance violation warning for employees' failure to be in proper uniforms. The review also stated that the store was looking much better.  In January 2008,

Store 2 was issued a compliance warning for product temperature and product quality.

In late 2007 or early 2008, Subway Corporate received an unidentified customer complaint stating that the employees at Store 2 had changed and the customer did not feel comfortable in the store.[2]  Around that timeframe and after receiving the customer complaint, Anthony Heilman had a conversation with Shaver concerning diversity.[3]  The conversation lasted approximately five minutes, and during this conversation, Anthony Heilman used the term "melting pot of America." Heilman talked about different backgrounds.  In Heilman's statement to the KHRC, he stated that he used the term to demonstrate how the store should mirror the community in its racial diversity. Heilman did not tell Shaver that she could not hire people of a certain race.

During this conversation, Heilman did not reprimand Shaver for her hiring choices. Shaver testified that she interpreted the conversation to mean that she could not hire any more African-Americans.   Shaver joked with other employees that she could not hire any more blacks. Upon hearing the jokes being made, Heilman came back and told Shaver that his previous conversation was not intended to convey that she could not hire employees of a certain race.

Shaver had attendance and timeliness issues throughout her employment with Rottinghaus. She was habitually late to work by several minutes or more.  Rottinghaus' attendance policy provides, in part, that (1) an employee is considered absent if he or she is not present for work as scheduled, regardless of cause; (2) excessive absenteeism is defined as being absent three times (excused or unexcused) in a 12-month period; (3) excessive tardiness is defined as, arriving more

---

[2]Subway also received a complaint that a Caucasian individual attempted to apply for a position at Store 2 but was told that they would not hire "white people."  This complaint makes reference to adverse employment actions against Caucasians, not African-Americans.

[3]Heilman asked Wood to have the conversation with Shaver, but Wood declined to do so.

than five minutes late, three or more times in a 12-month period; (4) an employee who is more than five minutes late, regardless of cause, is considered tardy; (5) an employee who is frequently late (less than 5 minutes) may also be considered excessively tardy and subject to disciplinary action; and (6) anyone who does not call or show for a scheduled shift is considered a voluntary quit.

Under this attendance policy, an employee can be written up after he or she is five minutes late.  After three write-ups, the employee may get a last chance warning, unless the violations are habitual, in which case the employee may be terminated or demoted.  Managers have discretion whether or not to issue consultations and, often, in the instance where an employee is only ten or fifteen minutes late will choose not to take any disciplinary action against the employee.  Wood followed this practice with her employees, including Shaver, and refrained from issuing consultations for minor attendance violations.

On January 25, 2008, Shaver received her first attendance consultation and was told she must call her regional manager, Wood, from the store each day when she arrived to work.

On January 31, 2008, Sarah Guy and Aleena Taylor were transferred from another location to Store 2.  Rottinghaus' records indicate that Guy is Caucasian and Taylor is American Indian, but both appear "white."  Although Shaver's responsibilities generally included making the hiring decisions, Wood, Shaver's regional manager, authorized the transfer.  Wood testified that Guy and Taylor were transferred because she believed that Shaver was having problems with the individuals closing at Store 2.  Shaver testified that she was not having problems, and she understood that Guy and Taylor were transferred because they had an altercation with another individual at their previous store.

Guy and Taylor first appeared on the schedule the week ending February 5, 2008. As Store Manager, Shaver was responsible for creating the schedule during this time, and she posted the weekly schedule each Tuesday. Shaver called her staff every Tuesday and let them know their hours the following week. Pursuant to the Rottinghaus Employment Handbook, labor schedules are to be made one week in advance. Rottinghaus' attendance policy also provides that employees are solely responsible for checking the schedule and reporting to work as scheduled.

On February 12, 2008, Shaver was again consulted for attendance violations. Pursuant to this written consultation, within a one week period, Shaver arrived approximately one hour late on three different days and did not consistently call her regional manager as required by the first consultation. The consultation provided that her attendance affected store operations. The February 12, 2008 consultation includes written language that any further attendance violations would result in her demotion from manager. On February 23, 2008, Shaver did not clock in until 9:12 a.m. for her 8:00 a.m. shift. Shaver admits she was approximately fifteen minutes late as she testified that she arrived at approximately 8:15 a.m., but she forgot to clock in until after 9:00 a.m.

On Tuesday, February 26, 2008, Shaver was demoted from Store Manager to Sandwich Artist, effective February 27, 2008. The process to demote Shaver was initiated by Wood. Anthony Heilman, with input from Wood, made the decision to demote Shaver. Wood and Danielle Heilman met with Shaver to explain that she was being demoted and transferred to a different store.

Prior to being demoted on February 26, Shaver posted the schedule for the new week, which was to begin the following day. Wood removed the schedule on February 26, 2008 to recreate it for the week. As of 11:00 a.m. on February 27, 2008, the schedule was not posted.

Bryan Stoves, a Caucasian, replaced Shaver as Store Manager at the 21st Street and Woodlawn store. Stoves began working on February 27, 2008 and worked approximately 55 hours that week. Stoves was terminated approximately one month later for attendance issues.

Following Shaver's demotion, she was transferred from Store 2 to the Subway store located at Central and Ridge ("Store 3"). Robin Smith, Shaver's previous manager, was the manager of that store, and Danielle Heilman was the Regional Manager. Store 3 is farther from Shaver's home than Store 2. Rottinghaus provided two reasons for the transfer of Shaver. First, Shaver previously worked well with Smith. In addition, it is Rottinghaus' common policy to transfer managers after a demotion to avoid conflict or tension in the stores between new and former managers.

As a result of the demotion, Shaver's hours were automatically reduced because Store Managers are full time positions and required to work a minimum of 45 hours per week, while Sandwich Artists are part time positions. Immediately following the transfer, Shaver initially only worked a few hours a week while Smith worked her into the schedule on a regular basis.

Shaver filed a complaint with the KHRC on March 24, 2008 alleging racial discrimination. Wood and Smith testified that they became aware of Shaver's discrimination complaint sometime in March 2008.

On April 3, 2008, Shaver was scheduled to work from 11:00 a.m. to 2:00 p.m. Shaver called in at 10:00 a.m. to report that she would be late, and she arrived at 12:00 p.m. Her store manager, Smith, approved it.

When Shaver arrived at work, she was out of uniform. Although Shaver was out of uniform, Anthony Heilman gave Shaver permission to finish her shift and be written up for both an attendance and uniform violation. Danielle Heilman issued Shaver the written consultation for being

late and out of uniform.  Shaver disputed the consultation because she claimed that Smith, her manager, excused her late arrival.  Shaver was not terminated and did not receive a reduction in pay as a result of the employee consultation.

On April 4, 2008, Shaver filed a complaint with the KHRC alleging retaliation for being written up.

On April 11, 2008, Shaver called in for her shift, but she did not appear nor find a replacement as required by policy.  Shaver's last day worked was on or about April 19, 2008. Shaver was scheduled for shifts after April 19.  Shaver was offered additional hours for at least one week during her employment at Store 3, but Shaver declined because she felt like she was being used.

On April 23, 2008, Shaver texted Smith asking if she was scheduled to work that day.  Smith replied that Shaver worked at 11 until 4.  Shaver replied that she was not coming in and to take her off the schedule for the rest of the week because she was sick.  Shaver stated that she would get a doctor's note.

On April 29, 2008, Smith sent Shaver a text message asking her "Am I putting you on the schedule?"  Shaver claims she did not receive the text.  Smith did not get a response from Shaver.

Sometime in April, Shaver requested a leave of absence for medical reasons.  On April 23, 2008, Jennifer Sass, Human Resources Manager, sent Shaver FMLA paperwork for Shaver to complete and return to Sass along with a work release from her physician.   On April 28, 2008, Shaver filed a third charge with the KHRC alleging retaliation.  In this charge, Shaver alleged that she requested a transfer from the store she was assigned and that she had been denied the transfer and not given sufficient work hours.

On May 13, 2008, Sass sent Shaver a follow up letter stating that she had not yet received Shaver's completed FMLA paperwork.  At some point after Shaver failed to report or call in to work and failed to submit her completed FMLA paperwork, Rottinghaus was uncertain of Shaver's employment status and whether Shaver intended to return to work.  Upon receiving no response from Shaver, Rottinghaus deemed her to have quit pursuant to its no call/no show policy.  On Shaver's termination/resignation form, which it did not process until October 1, 2008, Shaver is identified as eligible for rehire, and Sass testified that Shaver is eligible for reemployment.

### *Franklin*

Franklin began his employment on or about August 31, 2007.  Prior to the transfer of Guy and Taylor on January 31, 2008, payroll records indicate that Franklin worked an average of 18.9 hours weekly.[4]  There were three weeks during Franklin's employment in which he worked 10.31 hours, 9.66 hours, and 6.73 hours.  In the first two weeks of February, the two weeks immediately following Guy's and Taylor's transfer, Franklin's hours decreased to 3.17 and 3.06 hours, respectively.  Franklin's hours went up during the last two weeks of February.  His weekly average for February was approximately 10 hours.

After Shaver's demotion on February 26, 2008 and Wood's removal of the schedule, Franklin called in on February 26 to check the schedule and Medley told him that the schedule was gone and that Wood was rewriting the schedule. On Wednesday, February 27, 2008, at approximately 11:00 a.m., Franklin called to check the schedule and Medley told him that it had not been put up.  He did not speak to Wood or the new manager.  Payroll records indicate that Franklin worked the previous four Wednesdays immediately preceding Shaver's demotion.  Franklin did not

---

[4]With respect to each Plaintiff's weekly hours, the Court used Plaintiff's weekly average over the entire time they worked for Subway.

show up for a shift on Wednesday.

On Saturday, March 1, 2008, Franklin went to the store to pick up his check and check the schedule.  Upon his arrival, a new employee told Franklin that he no longer worked there, and Franklin requested the employee to call the store manager.  Franklin briefly talked to Bryan Stoves who told Franklin that Wood fired him for no call/no show.

Franklin's last day of work was February 25, 2008.  Franklin filed a complaint with the KHRC on March 27, 2008 alleging that he was discriminated against because his hours were reduced after Guy and Taylor were transferred to the store.

### *Franklin-Hillard*

Franklin-Hillard began her employment on or about December 27, 2007.  During the five weeks prior to the transfer of Guy and Taylor on January 31, 2008, payroll records indicate that Franklin-Hillard worked an average of 27.89 hours weekly.  Following the transfer of Guy and Taylor, payroll records indicate Franklin-Hillard's weekly hours increased to 31.05 hours a week. Sometime around the weekend of Super Bowl in 2008, which was February 3, 2008, Wood initiated a discussion with Franklin-Hillard about the possibility of Franklin-Hillard moving into the manager training program.

After Wood and Danielle Heilman met with Shaver on February 26, 2008, they met with Franklin-Hillard to explain that her daughter, Shaver, had been demoted and would be transferred to another store. At some point prior to the meeting, Wood called other employees to come in and relieve Franklin-Hillard from her duties on February 26, 2008.  During Wood's conversation with Franklin-Hillard, Wood informed her that she could leave early.  At the time of the meeting, Franklin-Hillard had two hours remaining on her shift.

-10-

During the meeting, there was discussion as to whether Franklin-Hillard would be interested in transferring to a new store, but she declined because the 21st Street and Woodlawn store was near to where she lived.  Wood told Franklin-Hillard to call her if she wanted to remain on the schedule. Wood did not include Franklin-Hillard on the schedule she recreated because she had not heard back from Franklin-Hillard.

Franklin-Hillard called on Friday but was unable to reach Wood and did not leave a message. The next Monday, Franklin-Hillard went to the store and left her name and phone number on a piece of receipt with the employee present at the time and requested that the employee have Wood call her. Franklin-Hillard does not know whether Wood received the message.

Franklin-Hillard's last day worked was February 26, 2008.  On March 31, 2008, Franklin-Hillard filed a complaint with the KHRC alleging she was discriminated on the basis of her race because she was constructively discharged.

On May 30, 2008, Rottinghaus mailed Franklin-Hillard a letter offering an opportunity for reemployment.  The letter offered her a position at the 21st Street and Woodlawn location and stated that the position was available immediately with the offer start date open to her availability.  The letter further stated that Franklin-Hillard would be scheduled thirty hours per week.  Franklin-Hillard responded by letter declining the offer.

### *Fungasha*

Fungasha began her employment on or about December 5, 2007.  During the eight weeks prior to the transfer of Guy and Taylor on January 31, 2008, payroll records indicate that Fungasha worked an average of 17.60 hours weekly.  Following the transfer, payroll records indicate that Fungasha worked an average of 18.21 hours weekly.

Fungasha was at work on February 26, 2008, the day Shaver was demoted. Prior to Shaver's demotion, Shaver had made the schedule and Fungasha was scheduled to work on February 27, 2008. Wood took the schedule down and the schedule was blank, but Wood told Fungasha to follow the schedule Shaver had previously posted for the week. Fungasha did not call in or show for her shift the following day. To Rottinghaus' knowledge, Fungasha made no further attempts to check future schedules or request hours. Fungasha understood that she would be deemed to have quit if she did not call or show for her shift.

Fungasha's last day of work was February 26, 2008. Fungasha filed a complaint with the KHRC on March 25, 2008 alleging that her hours were reduced and she was constructively discharged because of her race.

### Medley

Medley began her employment on or about December 4, 2007. During the nine weeks prior to the transfer of Guy and Taylor on January 31, 2008, payroll records indicate that Medley worked an average of 28.76 hours weekly. Following the transfer, payroll records indicate that Medley worked an average of 27.48 hours weekly.

After Shaver was demoted, Medley called Wood to check the new schedule. Wood told Medley her hours, and Medley showed up for her next shift. Medley's hours initially decreased in the two weeks immediately following Shaver's demotion to 11.75 and 8.35 hours, respectively, but increased thereafter, ranging between 19 and 36 hours per week and averaging 25.4 hours per week. During her final month of work, Medley worked an average of 27.2 hours per week.

On March 25, 2008, Medley was issued an employee consultation for violating the dress code by not wearing the required visor.  Medley admits violating the uniform policy.  Medley filed a KHRC complaint on March 31, 2008 alleging race discrimination on the basis that her hours were reduced.   Defendant received the first complaint on or around April 14, 2008.

On April 8, 2008, Medley was issued a second employee consultation for arriving two hours late for her shift on April 2, 2008 and neglecting to call in for her shift on April 3, 2008 until two hours after her scheduled start time. Although Medley does not remember failing to call in on April 3, 2008, she does not disagree with the consultation.

On April 22, 2008, Medley was issued a third employee consultation for failing to find a shift replacement on April 21, 2008.  Medley refused to sign the consultation because she could not find anybody to cover her shift as she was at the hospital with her son because he was having seizures. The consultation provided that "this is your second consultation for attendance, three violations will result in termination."   On April 22, 2008, Medley was also issued a consultation for violating Rottinghaus' meal policy.  Medley refused to sign the consultation because she states that she did not violate the meal policy.

In addition, on April 22, Medley refused to make a sandwich for a customer, and the customer left as a result.  Wood addressed the issue with Medley and directed Medley to make sandwiches or clock out early. Medley responded, "I will punch your ass out before you make me clock out and leave early."  When calling for her ride, Medley made the comment, "You need to come pick me up cause I'm about to act a fool in this mother fucker."  Medley admits making both statements and that her conduct on April 22 violated Rottinghaus' policies.

On April 25, 2008, Medley was scheduled to work at 10:00 a.m. but did not arrive until 10:45 a.m. Medley was issued a fifth employee consultation citing attendance violations, insubordination, and inappropriate/threatening conduct for the incident occurring on April 22.[5] Medley was terminated on April 25, 2008 for attendance, insubordination, and inappropriate behavior. Medley filed a second complaint with the KHRC on April 28, 2008 alleging retaliation because she was written up and terminated.

### *Taylor*

Taylor began her employment on or about July 29, 2007. On August 27, 2007, Shaver issued Taylor an employee consultation for poor customer service for failing to comply with a customer request to put on new gloves before handling the customer's food. In addition, on that same day, Taylor was issued a second consultation for money shortage. All employees were issued that same consultation. On August 28, 2007, Shaver issued Taylor a third employee consultation for failing to fulfill all cleaning duties. Another employee was also issued a consultation for failing to fulfill all cleaning duties. On October 20, 2007, all employees, including Taylor, were issued a consultation for failure to meet weekly food cost goals.

Prior to Guy's and Taylor's transfer on January 31, 2008, Taylor worked an average of 15.5 hours a week.[6] The two weeks preceding their transfer, Taylor worked 5.86 hours and 11.57 hours, respectively. Taylor did not work the first week of February 2008, the week ending February 5, 2008. Taylor suffered a house fire the night of the Super Bowl, February 3, 2008, and was unable to work as a result after that date. Taylor was not on the schedule during the week ending February

---

[5]Although the consultation states that Medley refused to sign it, Medley testified that she had not seen the consultation before. However, Medley testified that she remembered the incident on April 22.

[6]Taylor was on maternity leave for a period of time during the fall of 2007.

12.  She was on the schedule for the week ending February 19, and she worked 13.38 hours. Taylor was not scheduled for the week ending February 26.

After Shaver's demotion on February 26, 2008, Wood did not include Taylor on the schedule because she did not know Taylor's status.  Following Shaver's demotion, Taylor called the store to see if she was on the schedule and she was not.  Taylor did not return to work.

Taylor's last day of work was on or around February 16, 2008.  Taylor filed a complaint with the KHRC on April 3, 2008 alleging race discrimination and filed an amended complaint on June 30, 2008.

On June 23, 2009, Shaver, Franklin, Franklin-Hillard, Fungasha, Medley, and Taylor filed this lawsuit asserting discrimination on the basis of race.  In addition, Shaver and Medley asserted retaliation claims.  Defendant now seeks summary judgment on all claims asserted against it.

## II.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[7]  "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[8]  A fact is "material" when "it is essential to the proper disposition of the claim."[9]  The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[10]

---

[7]Fed. R. Civ. P. 56(a).

[8]*Haynes v. Level 3 Commc'ns*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[9]*Id.*

[10]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

-15-

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[11]  In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[12]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[13]  The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[14]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[15] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[16]  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[17]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[18]

---

[11]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[12]*Id.* (citing *Celotex*, 477 U.S. at 325).

[13]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[14]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[15]*Adler*, 144 F.3d at 671.

[16]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[17]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[18]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.  Discussion

### A.  Defendant's Motion for Summary Judgment on Shaver's Claims  (Doc. 63)

#### *Discrimination Claim*

Shaver claims that Defendant discriminated against her when it demoted her from store manager to sandwich artist.  Under the familiar *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.[19]  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a nondiscriminatory reason for its action.[20]  If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation is pretext for discrimination.[21]

To establish a prima facie case of disparate treatment on the basis of race, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) it occurred under circumstances giving rise to an inference of discrimination.[22]  Shaver meets the first element because she is an African-American and a member of a protected class.  She also meets the second element as she was demoted which is an adverse employment action.  Shaver's demotion involved a transfer to a different store and a reduction in hours.

Shaver appears to argue that both the transfer and reduction of hours are separate adverse employment actions apart from her demotion.  The Court disagrees.  The transfer and reduction of hours are part and parcel of the demotion as it is uncontroverted that Defendant's common policy is to transfer managers after a demotion to a different store to avoid conflict in the store between the

---

[19]*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

[20]*Id.*

[21]*Id.*

[22]*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

new and former manager, and Shaver's new position involved less hours as it was not a full-time store manager position.   As to the third element, the Court finds that circumstances warrant an inference of discrimination as Shaver was replaced with a Caucasian manager.

Defendant's assertion that it demoted Shaver based on her attendance is a legitimate, nondiscriminatory reason.

The burden now shifts to Shaver to present sufficient evidence to raise a genuine issue as to whether the proffered reason is a pretext for race discrimination.[23]  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employers did not act for the asserted non-discriminatory reasons."[24]  Typically, a plaintiff makes a showing of pretext with: (1) evidence that the defendant's stated reason is false; (2) evidence that the defendant acted contrary to a written policy; and (3) evidence that the defendant acted contrary to an unwritten policy or practice.[25] Another way a plaintiff may demonstrate pretext is by producing evidence that she was treated differently from similarly situated employees who violated comparable work rules.[26]  Yet another way a plaintiff may demonstrate pretext is through prior treatment of the plaintiff or through the use of subjective criteria.[27]  The Court must consider this evidence as a whole.[28]

---

[23]*Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008).

[24]*Id.* (citation omitted).

[25]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[26]*Id.* at 1232.

[27]*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

[28]*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004).

Shaver asserts numerous theories as to why her demotion was pretext for race discrimination; however, the allegations do not reveal such weaknesses and implausibilities in Defendant's reason to make it unworthy of belief.  Defendant contends that Shaver was demoted because she had attendance issues.  Shaver does not dispute that she was late.  Instead, she relies on broad categories of evidence in an attempt to demonstrate pretext.  These include generally (1) write-ups; (2) racial comments; (3) inconsistent reasons and false statements for Defendant's decisions; and (4) differential treatment between employees.[29]

**Write-Ups**

With respect to Shaver's write-ups, Shaver claims that Defendant "peppered" her file with consultations to justify her eventual demotion.  Shaver's file, however, was not "peppered" with consultations; she received three.[30]  Although these consultations ultimately led to her demotion, Shaver does not dispute that she was late to work and she was written up because she was late. Instead, she argues that the timing of the write-ups is suspect because she was always late to work and the write-ups did not occur until after she hired an African-American crew and Heilman's melting pot conversation.  However, she provides no evidence as to the impropriety of the write-ups. Although it is undisputed that Shaver was always late to work, Shaver does not provide any evidence that her prior tardiness was in excess of a few minutes.  In contrast, Shaver's manager, Wood,

---

[29]Several items of evidence Shaver relies upon are inadmissible.  Plaintiffs did not bring a pattern or practice claim and are precluded from it now.  In addition, Shaver does not produce any evidence of a pattern or practice of discrimination.

With respect to the KHRC probable cause findings, these are also inadmissible.  *See Hamwi v. Den-Tex Central, Inc.*, 2010 WL 3878865, at *2 (D. Kan. Sept. 28, 2010) (citations omitted).  As such, this evidence is inadmissible to establish pretext.

[30]*Cf. Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (finding in a retaliation case that an adverse action had occurred when the plaintiff received approximately twenty warning letters over a two-year period after he filed a charge of discrimination).

testified that Shaver was allowed the same leniency as other managers until Shaver's tardiness became excessive and it became a problem with store operations.  Shaver does not direct the Court to any evidence indicating that Wood did not believe this.  Furthermore, Shaver does not dispute that her last consultation indicated she was an hour late to work three times that week and that her next tardiness would result in demotion.  As such, the Court cannot conclude that Defendant peppered her file with consultations.

Shaver asserts that her responsibilities were modified when Wood transferred in two employees because it was her job to hire employees.  The Court is not convinced that this slight modification of responsibilities demonstrates pretext when it does not relate to Defendant's asserted reason that it demoted Shaver because of attendance issues.

### *Racial Comments*

Shaver also argues that a racial animus can be established on the basis of several comments.  First, she argues that Heilman's conversation with her in which he used the term "melting pot" demonstrates a racial animus because Heilman's sole purpose for the meeting was to discuss race with Shaver.  However, "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions."[31]  A plaintiff must demonstrate that a nexus exists between the statement and the adverse employment action.[32]  Shaver presents no evidence that this comment has any nexus to her being written up for being late.   The fact that Heilman may have had a conversation that related to diversity, or the race of the employees, does

---

[31]*Cone v. Longmont United Hospital Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

[32]*Id.*

not demonstrate racial discrimination as to Shaver's admitted tardiness issues.[33]

Shaver also contends that Heilman's second discussion with her about race is sufficient to demonstrate pretext.  In Heilman's second discussion, he clarified to Shaver that he did not intend to convey that she could not hire African-Americans.  The Court is unclear as to how this demonstrates a racial bias or has any nexus to Wood issuing Shaver consultations for being late to work.

Shaver's reliance on Wood's one-time use in 2006 of the term nigger-rig in an effort to demonstrate an inference of racial bias is also misplaced.  As noted above, isolated comments playing no role in the adverse action are not sufficient to demonstrate a discriminatory animus.  Although Shaver worked for Defendant at the time, she did not hear Wood make the comment and it was not directed toward her.  There simply is no evidence that Wood's use of this word was related Shaver's demotion. As such, it is insufficient to demonstrate pretext.

Shaver also alleges that soon after Heilman's melting pot comment, Wood indicated that an entirely "white crew" replaced them in the store.  Although Wood made this comment in her deposition, the evidence does not support this.  Defendants offered evidence that in April 2008, at least four employees were non-Caucasian, and Medley continued to work for the store in April 2008.  Furthermore, as discussed with each Plaintiff, there are different circumstances surrounding each Plaintiff's adverse employment action.

---

[33]Plaintiffs also argue that the "purported" customer complaint that the employees had changed and the customer felt uncomfortable in the store demonstrates that Defendant's actions were motivated by race because the only difference in the store is that it was staffed by more African-Americans.  There are several problems with Plaintiffs' theory.  First, there is no reference to race in the customer complaint and it is speculative as to whether the customer was referring to an employee's race. Second, even assuming the complaint from a customer was about race, this does not indicate that Defendant engaged in race discrimination.  Instead, it would demonstrate that a customer made the complaint, and Defendant cannot be held liable for a customer's purported racial complaint. Finally, although Plaintiffs attempt to question the identity of the caller by implying that the complaint could have even been called in by an employee of Defendant, this is pure speculation.  There is no evidence that anybody other than a customer called in.

### *Inconsistent Reasons*

Shaver argues that Defendant's designation that she is eligible for rehire is untrue because another Plaintiff employee, Taylor, was designated as eligible for rehire and Taylor was not rehired by Defendant when Taylor applied for a position.[34] This is wholly unrelated to Defendant's reason for Shaver's demotion.  As such, it is insufficient evidence of pretext.  In addition, Shaver argues that the fact that she is eligible for rehire undercuts Defendant's reasons for her demotion.  However, Shaver does not explain how this discredits Defendant's asserted reason.   Shaver remained employed by Defendant after her demotion.  Defendant did not terminate Shaver after demotion. Rather, Shaver quit showing up for her shifts.  Defendant could designate Shaver as eligible for rehire without contradicting its reason for her demotion.

Plaintiffs contend that Defendant's allegations that Shaver was having problems with her staff because she hired friends and family is false.  However, Plaintiffs provide no evidence to controvert this.  Instead, Plaintiffs point to evidence that there was no policy against hiring friends and family and to testimony that there are positives to hiring friends and family.  Defendant does not contend that there are no positives in hiring friends and family.  Also, Defendant does not assert that it had a policy against hiring friends or family. As such, Plaintiffs' evidence is insufficient evidence of pretext because it does not demonstrate the falsity of Defendant's statement that Defendant believed Shaver was having difficulty managing her friends and family.

Shaver asserts that the compliance problems at her store were not the result of Shaver's alleged attendance issues.  However, Defendant does not assert that Shaver was demoted due to the

---

[34]There is some question as to whether Plaintiffs can rely on Defendant's statements that some plaintiffs are eligible for rehire.  Defendant contends it is inadmissible because its offer to rehire several employees was made as part of the KHRC conciliation process and is therefore inadmissible settlement negotiations.  *See* Fed. R. Evid. 408. However, as noted above, this is unrelated to Defendant's employment decision at issue.

compliance problems.  Defendant contends that Shaver was demoted due to her attendance issues.

In sum, Shaver does not identify any inconsistency or falsity in Defendant's asserted reason for her demotion.  As noted above, she agrees that she was late and that she was issued consultations for being late.  Accordingly, Shaver does not point the Court to any inconsistency or implausibility in Defendant's legitimate reason indicative of pretextual race discrimination.

### Differential Treatment

Shaver contends that she was treated differently from similarly situated individuals.  Shaver first argues that Wood was treated differently from her.  However, Wood is not similarly situated. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[35]  In this case, Wood is Shaver's regional manager, while Heilman was Wood's regional manager at the time.  Furthermore, Wood's performance problems occurred ten years prior to Shaver's performance problems and under different policies.[36]   With respect to Bryan Stoves, the Caucasian individual who took Shaver's place as manager of the store, he was terminated within a month for attendance issues. Shaver received more favorable treatment as she continued her employment.[37]

Shaver also asserts that she was treated differently from other employees because Defendant does not uniformly apply its attendance policy.  Shaver provides no evidence of any similarly situated employees who received more lenient, or differential, treatment under the attendance policy.

---

[35]*Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

[36]The Court notes that it appears that Wood was demoted and then terminated for her performance problems. She was then rehired by Defendant the following year.

[37]Shaver argues that Defendant has not produced any documents to support its position that Stoves was terminated for attendance issues.  Documentary evidence is not necessarily required.  Under Fed. R. Civ. P. 56(c)(1),a party can cite to depositions to support the assertion.  Furthermore, Shaver's argument that Stoves was somehow in a better position because he could possibly collect unemployment defies reason.

The attendance policy provides that three attendance violations calls for an automatic termination. However, Heilman testified that it was not applied uniformly to all employees because Defendant will sometimes allow an employee to be demoted, rather than terminated, based on prior work performance. In this case, Shaver was not terminated, but instead demoted. Shaver does not direct the Court to any evidence of similarly situated employees receiving more favorable treatment under the attendance policy.

Although Shaver asserts many reasons as to why Defendant's reason is pretextual, the evidence either does not support her contention or is irrelevant to Defendant's asserted reason. Furthermore, Defendant argues that it is entitled to the same-actor inference, i.e., when the employee is hired and fired by the same person within a relatively short period of time, there is a strong inference that the employer's stated reason for it is not pretextual.[38] In this case, both Wood and Heilman participated in Shaver's promotion and her demotion six months later.[39] Because Defendant is entitled to this same-actor inference, even if some of Shaver's evidence could be construed as valid pretext evidence, the inferences would balance out. As such, the Court concludes that Shaver does not present sufficient evidence to demonstrate pretext for race discrimination, and the Court grants Defendant's motion for summary judgment as to Shaver.

---

[38]*See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). A plaintiff is still entitled to present countervailing evidence to dispel the strong inference of non-discrimination. *Id.*

[39]Defendant's designated corporate representative, Sass, provided an affidavit in which she averred that both Wood and Heilman knew Shaver's race when they promoted her. Shaver argues that Sass does not have personal knowledge to testify that Wood and Heilman knew her race. However, Sass is the designated Fed. R. Civ. P. 30(b)(6) corporate representative. Defendant argues that Sass could therefore provide this information. *See Nat'l Union Fire Ins. Co. v. Reichhold, Inc.*, 2009 WL 1579544, at *5 (M.D.N.C. 2009) (determining that it would not strike statements in an affidavit because the affiant was the designated Rule 30(b)(6) corporate representative and familiarized himself with the facts attested to in the affidavit).

-24-

*Retaliation Claim*

Shaver also claims that Defendant retaliated against her.  Retaliation claims are also subject to the *McDonnell Douglas* burden-shifting framework.[40]  "To establish a prima facie claim for retaliation, a plaintiff must establish (1) he or she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action."[41]

As to the first element of her retaliation claim, Plaintiff Shaver asserts that she engaged in protected opposition when she complained to two other store managers that Anthony Heilman implied she could not hire any more blacks.  It appears that she then claims that Defendant retaliated against her by transferring in white employees and replacing her with a white manager. This, however, is improperly before the Court.  Exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under Title VII.[42]  "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim."[43]  Shaver did not allege in either of her KHRC retaliation charges that after voicing concerns about alleged comments, she was retaliated against by Defendant transferring in white employees and replacing her with a white manger. Indeed, in Shaver's two retaliation charges, she alleged that she had previously filed charges with the KHRC and was retaliated against when Defendant wrote her up and denied her a transfer and

---

[40]*Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1229 (10th Cir. 2004).

[41]*Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).

[42]*Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005).

[43]*Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007).

sufficient hours.[44]  Furthermore, Shaver did not include this theory in her Complaint or Pretrial Order.  "[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appear in the complaint."[45]  As such, to the extent Shaver asserts that Defendant engaged in retaliation when it transferred two white employees to her store and replaced her with a white manager, her claims are barred because they are not properly before the Court.

Plaintiff's complaints filed with the KHRC on March 24, 2008 and on April 4, 2008 are protected opposition and are properly before the Court.

With respect to the second element of a retaliation claim, "the plaintiff must show that a reasonable employee would have found the action materially adverse such that they might be dissuaded from making a charge of discrimination."[46]  The test is an objective one.[47] There is a distinction between a trivial harm and a materially adverse action.[48]  The court must focus on the "materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position" so as to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."[49]

---

[44]Shaver also does not reference any protected opposition to discrimination in her discrimination charge filed with the KHRC.

[45]*Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[46]*Somoza v. Univ. of Denver,* 513 F.3d 1206, 1213 (10th Cir. 2008).

[47]*Id.* at 1214.

[48]*Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1265 (10th Cir. 2007) (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L.Ed.2d 345 (2006)).

[49]*Id.* (citing *Burlington Northern*, 126 S. Ct. at 2416)).

-26-

Plaintiff Shaver does not identify in her briefing to the Court what acts she claims are materially adverse, does not specifically respond to Defendant's argument, and does not make any additional argument as to this element of her claim.[50]  In the Pretrial Order, Shaver identified three retaliatory acts: reducing her hours, transferring her to a store which was farther away, and writing her up on pretext.[51]  Although Plaintiff does not specifically brief the alleged adverse actions, the Court will nevertheless address them.

Only one of these acts, Shaver's write-up for being tardy and out of uniform, occurred after Shaver filed her first KHRC charge. With respect to this write-up, the Court finds it is not a materially adverse action.  Although a written warning may be an adverse employment action, it is not necessarily so, particularly when no significant change occurs in the plaintiff's employment status.[52]  Here, the write-up caused no change in Shaver's employment status as she was not terminated, did not lose hours, or experience any change in pay or responsibilities.[53]  As noted above, Shaver makes no argument, and points to no evidence, as to why a reasonable employee would find this write-up materially adverse.  The evidence also demonstrates that Shaver immediately filed a retaliation charge after receiving this write-up, further diminishing the material adversity of the action.[54]  As such, the Court concludes that no reasonable employee would be

---

[50]Plaintiff merely incorporates by reference all of the arguments she asserted in support of her discrimination claim.

[51]Notably, Shaver's "termination" is not at issue.

[52]See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1224 (10th Cir. 2006); see also Weil v. Carecore Nat'l, LLC, 2011 WL 2415791, at *7 (D. Colo. June 14, 2011).

[53]Although the write-up could have conceivably had an effect on her employment status had she been written up additional times, she did not receive any more.

[54]See Somoza, 513 F.3d at 1214 ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the [challenged] actions are sufficiently material and adverse to be actionable.").

deterred from pursuing a discrimination claim if she was written up with no corresponding change in employment status.

With respect to Shaver's reduction in hours and her transfer to a store located further away, Plaintiff cannot establish that these two acts are causally related to her protected activity. "A causal connection between a protected action and a subsequent adverse action can be shown through evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[55] In this case, both the transfer and the reduction of hours occurred simultaneously with Shaver's demotion and were a by-product of the demotion. Although Shaver alleged in her third KHRC charge that she was denied a transfer and not given sufficient hours, Shaver does not direct the Court to any evidence that she requested and was denied a transfer out of Store 3 subsequent to filing her KHRC charges. As Shaver's demotion (and transfer and reduction of hours) occurred prior to Shaver's KHRC charge of discrimination, these acts cannot be causally related to her protected activity. Accordingly, Shaver fails to establish a prima facie case of retaliation with respect to any of the three alleged retaliatory acts.[56]

As such, the Court grants Defendant's motion for summary judgment as to Shaver's retaliation claim.

### B.  Defendant's Motion for Summary Judgment on Franklin's Claims (Doc. 66)

 Franklin alleges that he was discriminated against because his hours were reduced and he was constructively discharged by Defendant when it removed him from the schedule. To establish

---

[55]*E.E.O.C. v. C.R. England, Inc*., 644 F.3d 1028, 1051 (10th Cir. 2011) (internal quotations and citations omitted).

[56]Even if Shaver could establish a prima facie case, Plaintiff directs the Court to no evidence as to why Defendant's reasons are pretext.

a prima facie case of disparate treatment on the basis of race, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) it occurred under circumstances giving rise to an inference of discrimination.[57]   The adverse employment action at issue warrants discussion.

Although Defendant's removal of Franklin from the schedule may constitute an adverse employment action because it effectively terminated his employment, it does not rise to the level of a constructive discharge.  "A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."[58]  "Working conditions must be so severe that the plaintiff simply had no choice but to quit."[59]  A plaintiff must demonstrate at the time of his discharge he did not have a free choice regarding the employment relationship.[60]  Under the facts presented, Franklin presents no evidence that his working conditions were so objectively intolerable that a reasonable employee would feel compelled to leave.  As such, the adverse employment actions at issue are Franklin's reduction of hours and removal from the schedule.

With respect to these two alleged adverse actions, the Court concludes that there are questions of fact precluding summary judgment.  Defendant contends that Franklin cannot establish a prima facie case because Franklin cannot demonstrate that Defendant took action to reduce his hours because Franklin's hours only reflect the hours worked, not scheduled. In support of this contention, Defendant offers the deposition testimony of Sass, who testified that Franklin requested

---

[57]*PVNF*, 487 F.3d at 800.

[58]*Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

[59]*Id.*

[60]*Id.*

off one day and called in for another shift.   This is insufficient to conclusively demonstrate that Defendant played no part in Franklin's reduction of hours because it only addresses a few shifts. As such, questions of fact exist as to Franklin's reduction of hours claim.

As to Defendant's removal of Franklin from the schedule, Defendant asserts that it simply enforced its no call/no show policy and treated Franklin as resigned when he failed to call or show up for his scheduled shift on February 27.  Franklin, however, presents evidence that he called the store twice, as late as 11:00 a.m. on February 27, inquiring as to whether he was scheduled and was told that the schedule had not been completed.  When Franklin showed up at the store on Saturday, another employee told him that he was terminated for a no call/no show on Wednesday, February 27.  Although there is evidence that Franklin worked the previous four Wednesdays, there is also evidence that Defendant does not have set shifts. There is also evidence demonstrating that Franklin was not having performance problems.   As such, under these circumstances, the Court concludes that Franklin presents sufficient evidence to preclude Defendant's motion for summary judgment. As such, the Court denies Defendant's motion for summary judgment.

**C.  Defendant's Motion for Summary Judgment on Franklin-Hillard's Claims (Doc. 68)**

Franklin-Hillard alleges that she was discriminated against because her hours were reduced and she was constructively discharged by Defendant when it removed her from the schedule.  The Court set forth the elements of a prima facie case of disparate treatment above.  Again, the adverse employment action at issue warrants discussion.

With respect to Franklin-Hillard's contention that her hours were reduced, her claim is not supported by the evidence.   Franklin-Hillard's hours averaged 27.89 hours per week prior to the transfer of Guy and Taylor on January 31.   After the transfer, Franklin-Hillard's weekly average increased to 31.05 hours a week.   As such, Franklin-Hillard does not have a claim for reduction in hours, and the adverse employment action at issue is Franklin-Hillard's removal from the schedule.

Defendant asserts the legitimate reason that it removed Franklin-Hillard from the schedule was because it deemed Franklin-Hillard as resigned because she did not contact Wood to inform Wood that she wanted to remain on the schedule.

Franklin-Hillard simply does not provide sufficient evidence to raise a genuine issue as to whether the proffered reason is a pretext for race discrimination. None of the evidence provided by Franklin-Hillard relates to Defendant's articulated reason for removing Franklin-Hillard from the schedule.[61]   "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[62]   Franklin-Hillard has shown no inconsistency in Defendant's contention that Defendant deemed her resigned because she did not contact Wood.   Franklin-Hillard admits that Wood told her during the February 26 meeting to call Wood if she wanted to remain on the schedule.   Although Franklin-Hillard did call Wood on Friday, she did not speak with her and did not leave a message.

---

[61]The five Plaintiffs who have asserted discrimination claims for reduction in hours, constructive termination, or both reduction of hours and constructive termination all rely upon the same pretext evidence for each of their claims. Despite the many allegations of pretext, the allegations do not reveal such weaknesses, implausibilities, or inconsistencies in Defendant's asserted reason for the particular adverse action to make it unworthy of credence. *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). Furthermore, the fact that the circumstances surrounding one employee's adverse employment action may raise a question of fact with respect to that employee, it does not necessarily follow that it leads to a question of fact or an inference of discrimination with respect to the other employees. Although the Court has viewed the evidence as a whole with all of the plaintiff in this case, it also must consider the individual circumstances.

[62]*Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1170 (10th Cir. 2007) (citation omitted).

Franklin-Hillard left a message on a piece of paper the following Monday but admits she does not know whether Wood received that message.  As such, Franklin-Hillard does not demonstrate that Defendant's reason for removing her from the schedule was pretext for discrimination, and the Court grants Defendant summary judgment on Franklin-Hillard's claim.

### D.  Defendant's Motion for Summary Judgment on Fungasha's Claims (Doc. 70)

As an initial matter, Defendant asserts that Fungasha's claim is barred because she failed to file suit within ninety days of receipt of Right to Sue Notice.  29 U.S.C. § 626(e) states that when a charge is terminated or dismissed by the EEOC, a plaintiff has 90 days after notice of the termination or dismissal in which to file a civil action. On September 17, 2008, the EEOC issued a Dismissal and Notice of Suit Rights to Fungasha.[63]  Pursuant to this notice, Fungasha was required to file suit within ninety days, and she did not file suit until June 23, 2009.  The EEOC sent a letter dated June 25, 2009 which indicated that it had previously mailed Fungasha a Notice of Suit Rights dated September 17, 2008, but its records did not reflect whether she had received it.

Fungasha provides an affidavit averring that she did not receive a Right to Sue letter from the EEOC in September, 2008 and that she received a letter and a copy of the Right to Sue letter in June, 2009.  Defendant asserts that Fungasha attempts to create a sham fact issue because Fungasha testified at her deposition that she received the September 17, 2008 notice.  In reviewing the deposition, the Court finds Fungasha's testimony as to whether she received notice in September, 2008 less than clear.[64]  However, even if there is a factual issue as to when Fungasha received the notice and to whether Fungasha timely filed suit, her claim would still fail.

---

[63]Plaintiffs dually filed with the KHRC and EEOC.

[64]She first testified that she did not remember whether she received either the notice in September, 2008 or the letter in June, 2009.  She then testified that she thought she received the September, 2008 notice.

Fungasha alleges that she was discriminated against because her hours were reduced and she was constructively discharged by Defendant when it removed her from the schedule. Fungasha's claim that she suffered an adverse employment action because her hours were reduced is not supported by the record. Fungasha's hours averaged 17.6 hours per week prior to the transfer of Guy and Taylor on January 31. After the transfer, Fungasha's weekly average increased to 18.2 hours a week. As such, Fungasha does not have a claim for reduction in hours.

With respect to Fungasha's removal from the schedule, although this may constitute an adverse employment action because it effectively terminated her employment, it does not rise to the level of a constructive discharge. The Court set forth the constructive discharge standard above. Under the facts presented, Fungasha presents no evidence that her working conditions were so objectively intolerable that a reasonable employee would feel compelled to leave. To the contrary, the evidence demonstrates that Fungasha did not call or show up for a scheduled shift that she admittedly knew about. Pursuant to Defendant's policy, she was deemed to have resigned and was no longer included on the schedule.

Fungasha provides no evidence of such weaknesses or contradictions in Defendant's proffered reason for its action that a reasonable factfinder could rationally find them unworthy of credence. The majority of the evidence relied upon by Fungasha does not relate to Defendant's articulated reason for removing Fungasha from the schedule. Fungasha testified that Wood told her to follow the schedule Shaver previously made. She also testified that she knew she was scheduled for a shift on February 27, and she did not call in to check the schedule. In short, Fungasha presents no evidence that Defendant's reason for removing her from the schedule was a constructive discharge or pretext for discrimination. As such, the Court grants Defendant summary judgment.

**E.  Defendant's Motion for Summary Judgment on Medley's Claims (Doc. 72)**

*Discrimination Claim*

Medley alleges that she was discriminated against because her hours were reduced and she was constructively discharged.  The Court set forth the elements of a prima facie case of disparate treatment above.  With respect to Medley's reduction in hours claim, Medley's hours averaged 28.76 hours a week the nine weeks prior to the transfer of Guy and Taylor on January 31.  After the transfer, Medley hours decreased marginally 1.3 hours per week to 27.48  Medley's hours initially decreased in the two weeks immediately following Shaver's demotion to 11.75 and 8.35 hours, respectively, but increased thereafter, ranging between 19 and 36 hours per week and averaging 25.4 hours per week. During her final month of work, Medley worked an average of 27.2 hours per week.

To constitute an adverse employment action,  "[a] plaintiff must demonstrate that the alleged adverse action caused more than '*de minimis* harm' to or a '*de minimis* impact' upon an employee's job opportunities or status."[65]   In considering Medley's employment history as a whole, Medley's average hours were between 25 hours and 27 hours a week.  It appears that Medley suffered a reduction of hours of approximately 2 hours a week.  The Court concludes that this is *de minimis* and does not constitute an adverse employment action.

In addition, to the extent Medley claims that her hours were reduced so low after the transfer of Guy and Taylor that it operated as a constructive discharge, her claim fails.  The evidence demonstrates that Medley continued to work for Defendant until April 25, 2008, approximately three months after Guy and Taylor's transfer on January 31, 2008.  Medley presents no evidence that her working conditions were so objectively intolerable that she did not have a free choice as to her

---

[65]*C.R. England,* 644 F.3d at 1040.

employment relationship.  As such, the Court grants Defendant's motion for summary judgment as to Medley's reduction in hour and constructive discharge claim.

### *Retaliation Claim*

Medley also brings a retaliation claim alleging that she was retaliated against after filing her KHRC complaint.  For the purposes of this order, the Court assumes Medley can establish a prima facie case.

Because Medley establishes a prima facie case of retaliation, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.[66]  Defendant asserts that it issued written consultations to Medley for violation of its policies and ultimately terminated Medley for attendance, insubordination, and inappropriate behavior.  Defendant satisfies its burden.

The burden now shifts back to Medley to demonstrate why Defendant's stated reasons are pretextual.[67]  Although close temporal proximity may be sufficient to satisfy a prima facie case of retaliation, timing alone is insufficient to demonstrate pretext.[68]  Medley provides no reason as to why her termination or the consultations Defendant issued after learning of Medley's KHRC complaint are pretext for discrimination.[69]  Medley does not dispute that she violated the attendance policy and that her conduct violated Defendant's policies.  Indeed, Medley admits that her behavior was inappropriate and that she unfortunately allowed her manager to get the best of her.  Medley

---

[66]*Meiners*, 359 F.3d at 1229.

[67]*Id.*

[68]*Annett*, 371 F.3d at 1240.

[69]Medley provides no specific argument nor evidence as to why Defendant's reasons are pretext for discrimination but rather incorporates by reference her previous arguments relating to her discrimination claim.

points to no inconsistency or implausibility in Defendant's reason nor any evidence that Defendant's reason for terminating her for attendance, insubordination, and inappropriate behavior was pretext. As such, the Court grants Defendant summary judgment on Medley's retaliation claim.

**F.  Defendant's Motion for Summary Judgment on Taylor's  Claims (Doc. 74)**

Taylor alleges that she was discriminated against because her hours were reduced and she was constructively discharged by Defendant when it removed her from the schedule.  The Court set forth the elements of a prima facie case of disparate treatment above.  As with the other Plaintiffs, the adverse employment action at issue warrants discussion.

Taylor's claim that she suffered an adverse employment action because her hours were reduced is not supported by the record.  Taylor's hours were already reduced prior to the transfer of the two employees on January 31.  Taylor worked 28.67 and 25.42 hours the first two weeks of January; however, the next two weeks she only worked 5.86 and 11.57 hours, respectively. Although Taylor asserts that her hours were reduced after John English, a Caucasian, was added to the schedule in January, her hours reached the lowest point in January prior to any Caucasian employee being added to the schedule.[70]  The week English was added to the schedule, Taylor's hours went up from 5.86 hours to 11.57 hours.  Furthermore, Taylor did not work the first two weeks of February, immediately after the transfer of the two employees at issue, because she admittedly suffered a house fire and was not placed on the schedule.  In fact, she only worked one week out of four in February. As such, Taylor does not have a claim for reduction in hours.

---

[70]Taylor is the only plaintiff attempting to allege a reduction of hours, or adverse employment action, with respect to English's addition to the schedule.  However, this is not supported by the record.

With respect to Taylor's removal from the schedule, although this may constitute an adverse employment action because it effectively terminated her employment, it does not rise to the level of a constructive discharge. The Court set forth the constructive discharge standard above. Under the facts presented, Taylor presents no evidence that her working conditions were so objectively intolerable that a reasonable employee would feel compelled to leave.

Defendant asserts the legitimate reason that Wood did not include Taylor on the schedule because she believed that Taylor was no longer an active employee.

Taylor simply does not provide sufficient evidence to raise a genuine issue as to whether the proffered reason is a pretext for race discrimination. None of the evidence provided by Taylor relates to Defendant's articulated reason for not including Taylor on the schedule. Wood did not include Taylor on the schedule because she did not know Taylor's status as an employee because Taylor was not on the previous week's schedule. Taylor provides no evidence demonstrating any inconsistency or implausibility with respect to Defendant's reason. Although Taylor contends that she called to see if she was on the schedule, it is uncontroverted that Taylor only worked one week out of four in February, and she was not scheduled the week prior to Wood taking over the schedule. There is no evidence indicating that Wood knew Taylor wanted, or was able, to be on the schedule. As such, Taylor presents insufficient evidence demonstrating that Defendant's reason for removing her from the schedule was pretext for race discrimination. As such, the Court grants Defendant's motion for summary judgment with respect to Taylor.

**IT IS ACCORDINGLY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 63) as to Plaintiff Shaver is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 66) as to Plaintiff Franklin is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 68) as to Franklin-Hillard is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 70) as to Fungasha is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 72) as to Medley is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 74) as to Taylor is **GRANTED**.

In sum, all of Shaver's, Franklin-Hillard's, Fungasha's, Medley's and Taylor's claims are dismissed.  Franklin's reduction in hour and removal from the schedule claims remain.

**IT IS SO ORDERED**.

Dated this 2nd day of September, 2011.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE